**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| **JIBAU W. HARVEY**, | Case No. 5:10 CV 1633 |
| Plaintiff, | U.S. District Judge John R. Adams |
| - v. - | |
| **PARTSSOURCE, INC.**, et al., | |
| Defendants | |

## DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SANCTIONS

"False testimony in a formal proceeding is intolerable." ABF Freight Sys., Inc. v. NLRB, 510 U.S. 317, 323 (1994). Plaintiff Jibau W. Harvey gave false answers under oath to several Interrogatories and to questions posed to him at his deposition. These falsehoods went to critical issues in this case: the legitimacy of Defendants' non-discriminatory reason for Harvey's discharge, the viability of Defendants' set-off defenses, the extent to which Harvey has mitigated his damages, and Harvey's credibility. The falsehoods also had the effect of concealing the true nature of Harvey's post-discharge activities from both Defendants and the Court. Harvey's false testimony is nothing less than a fraud upon this Court and warrants the severest possible sanctions.

### I.
### HARVEY'S TESTIMONY

PartsSource served Interrogatories upon Harvey on November 5, 2010, which Harvey answered on December 13, 2010.[1] [Harvey's Answers to Interrogatories, attached as Exhibit A.]

---

[1] Harvey did not serve a Verification of his answers, but he confirmed at his deposition that all information contained in his answers was truthful. [Harvey Dep. 339:17-340:20].

Defendants also took Harvey's deposition on December 20, 2010. [See Transcript of Deposition of Jibau W. Harvey, ECF No. 60 ("Harvey Dep")].

In both Harvey's Interrogatory Answers and his deposition testimony, Harvey gave testimony that later discovery proved false. These inaccuracies each had the effect of concealing the true nature and extent of the relationship between Harvey and Lawrence Wojtala and Wojtala's business enterprises, Medfirst Solutions, Inc. ("Medfirst") and Sequoia Medical Corp. ("Sequoia").

### A. **Whether Harvey Had Worked Since His Discharge From PartsSource.**

At his deposition, Harvey denied that he had worked at all since leaving PartsSource:

> Q. Tell me every place you've worked since May 13th, 2009.
>
> A. *I haven't worked anywhere*. [Id., 75:11-13, emphasis added].
>
> * * *
>
> Q. Since your employment with PartsSource ended, have you been offered a position anywhere?
>
> A. *I have not*. [Id., 308:7-10, emphasis added].

In the same way, when answering Interrogatory 11, which asked Harvey to identify "every employer other than PartsSource that you have had since January 1, 2008," Harvey responded: "None." [Exhibit A, p. 9]. When asked to list all places from which he had sought employment, Harvey identified only one "DoubleTree manager position" and the websites www.hotjobs.com and www.theladders.com. [Answer to Interrogatory 12, Exhibit A, p. 9].

Harvey's sworn testimony also confirmed that he had not worked as an independent contractor since leaving PartsSource. Answering Interrogatory 10, Harvey stated that he "has not been self-employed" at any time during the ten-year period preceding his answer. [Exhibit A, pp. 8-9]. When asked at his deposition whether he was an independent contractor, he responded, "I am not." [Harvey Dep. 62:8-10].

Lastly, when asked in Interrogatory 13 to identify all of his sources of income other than PartsSource since January of 2008, Harvey identified only three people whom he had "help[ed] .. with physical fitness" and who had paid him just $8,800 over approximately the past three years. [Exhibit A, p. 10]. The names "Lawrence Wojtala" and "Medfirst Solutions, Inc." appear nowhere in Harvey's answers to PartsSource's Interrogatories.

B.      **The Nature and Extent of Harvey's Dealings with Lawrence Wojtala**

Defendants discovered through their own investigation that Harvey had engaged in suspicious email communications with Lawrence Wojtala several months before his employment with PartsSource had even ended. [Cf. Harvey Dep. 353:8-354:6]. Defendants' counsel asked Harvey at his deposition whether he had any email communications with Wojtala since his discharge. Harvey denied having any memory of any:

> Q. … Have you had any e-mail communication with Larry Wojtala?
>
> A. I don't recall. I don't think so. [Harvey Dep. 56:15-17].

Defendants then asked if Harvey had received money from Wojtala. Harvey admitted that he had (contradicting his earlier answer to Interrogatory 13). [Id., 76:10-77:5]. But Harvey testified that the money was only "referral money." [Id.] Harvey claimed that after his discharge from PartsSource, "many of my customers that I had while I worked there would call me and ask me, you know, if I could find medical parts and stuff for them, and I would refer them to -- to Sequoia Medical," one of Wojtala's entities. [Id. 77:21-79:8]. Harvey stated that if Wojtala "was able to make – make a sale, typically once that client paid him, then, you know, he would give me a referral fee," and that Wojtala thereafter "deposited money into my account." [Id., 82:14-83:23]. Harvey claimed not to know how Wojtala put the money into Harvey's bank account. [Id.] Harvey stated that he was "not sure" how many referrals he made to Wojtala, "[m]aybe --

- 3 -

approximately three to six or seven or something. I don't know. Maybe more, maybe less." [Id. 94:14-19].

Harvey was emphatic at his deposition that he gave Wojtala *no help* in figuring out how to source or otherwise manage these transactions, even though he admitted that he had no clue how Wojtala, a custom homebuilder, would have had knowledge of how to do this work himself:

> Q. Does Mr. Wojtala work day to day as a custom home builder, to your knowledge?
>
> A. Yes.
>
> Q. Now, when you would get a request from a customer for a part, because Mr. Wojtala was a custom home builder, how was it that he was supposed to source that part?
>
> A. I mean, I don't know how he set up his -- his business. *He apparently knew how to do all that and was able to do it*. It wasn't my -- it wasn't my -- my problem.
>
> Q. Okay. *Did you ever tell him* where he might go to find a source for a part?
>
> A. *No*.
>
> Q. *Never once*?
>
> A. *No*.
>
> Q. Did you tell him how to go about looking to source a part?
>
> A. *No*. [Id., 95:13-96:6, emphasis added].

Harvey specifically denied engaging in any actual work for Wojtala:

> Q. Have you had discussions with Larry Wojtala about working with him?
>
> A. *Not working with him. No, not anymore than the relationship that I described to you earlier*.
>
> Q. Have you had any discussions with Larry Wojtala about working for his companies after your restrictions end?
>
> A. *No*. [Id. 308:11-19, emphasis added].

- 4 -

**C.    What Email Addresses Harvey Has Used.**

PartsSource also asked Harvey at his deposition to identify all email addresses he used.[2]

Harvey gave four addresses, but did *not* disclose any "medfirstsolutions.com" address:

> Q. What e-mail addresses have you used since August 1st, 2004?
>
> MS. WILLIAMS: Objection.
>
> A. I mean, I would say there was a jharvey@mypartssource.com. There was a jharvey@partssource.com. I currently use a jibbyman@hotmail.com. I think I might have an AOL address, ferra512tr@aol.com.
>
> Q. Hold on. I want to make sure I got the last one. Ferra, F E R R A –
>
> A. 512tr@aol.com.
>
> Q. Okay. Any others?
>
> A. That's all I can remember at this time.
>
> Q. What does ferra512tr stand for?
>
> A. Ferrari 512 Testarossa.
>
> Q. Are there any other e-mail addresses that you can remember other than jharvey@mypartssource.com, jharvey@partssource.com, jibbyman@hotmail.com and ferra512tr@aol.com?
>
> A. *Since 2004, that's all I can recall right now*. [Harvey Dep., 51:16-52:4, emphasis added].

---

[2] This information was needed so that PartsSource could identify the proper custodians and service providers to obtain discoverable emails. Harvey produced virtually no emails in discovery and continued routinely deleting emails, even after filing his charge of discrimination in September of 2009 [see Harvey Dep. 53:9-55:15]. Harvey also admitted to discarding one of the computers he used since leaving PartsSource and taking no steps to preserve discoverable information that may have been located on it. [Id. 66:1-71:13]. Harvey admitted that he used this computer to send and receive potentially relevant emails [Id., 68:6-15] and to conduct his claimed job search [Id., 69:15-18], but claimed not to know whether or not this computer contained any information about PartsSource, Wojtala, Medfirst, or Sequoia. [Id., 70:7-71:12].

## II.
## THE FALSITY OF HARVEY'S TESTIMONY

On February 28, 2011, Defendants received documents from a third party witness, Mediserve Insurance Services, Inc. and its affiliated company Specialty Underwriters, in response to a Subpoena Duces Tecum. [See Exhibit B]. These emails demonstrate Harvey engaging in active work on behalf of Medfirst – quoting prices for Mediserve and Specialty Underwriters employees and customers, requesting payment, checking on the status of returns, arranging for service, and asking and answering questions about parts transactions – between at least November 10, 2009, and June 2, 2010. [See, e.g., Exhibit B, pp. D3962-3969, D3972, D3974, D3981-3992, D3994, D4000-4005, D4006-4008, D4011-4023]. Many of these emails contain a signature block identifying Harvey as:

> Jibau Harvey
> Senior Account Executive
> Medfirst Solutions
> 216.491.2120 office
> 330.802.0235 cell (best)
> sales@medfirstsolutions.com additional email
> www.medfirstsolutions.com website

[Exhibit B, pp. D3969, D3991, D4000, D4002, D4004, D4014, D4024].

In one of the emails, Harvey bemoans how he had done "all this work" for one of Mediserve's clients who had decided ultimately to buy from someone else, and that this was "the third time" this had happened and that Harvey was afraid of losing future "business":

> Nichelle still bought the part somewhere else despite the fact she asked for better pricing and I provided it. *This is the third time she has asked me to match or beat a quote and purchased the part somewhere else*. Has she conveyed some type of personal issue with me to you? *It is really frustrating to put all this work for nothing*. I promised the vendor if he lowered his cost he would get the deal. *She is making me look bad to my vendors. Stints like this will cause them not to do business with me.* Thanks J. [Exhibit B, p. D3993, emphasis added].

- 6 -

The above emails are irreconcilable with Harvey's prior testimony that he hasn't "worked anywhere" since leaving PartsSource [Harvey Dep. 75:11-13], whether as an employee or an independent contractor [Id., 62:8-10; Exhibit A, pp. 8-9], and that he had never once helped Wojtola [Harvey Dep. 95:13-96:6] and never discussed with Wojtola the possibility of working with him [Id., 308:11-19]. The emails show that Harvey's interactions with Mediserve and Specialty Underwriters were done under the banner of Medfirst. Harvey stated at his deposition that "the only person I ever dealt with at Medfirst was Larry Wojtala." [Id. 293:9-10] The above emails are also irreconcilable with Harvey's testimony that when his former customers would ask him for parts, he would simply refer them to Wojtola, who would do the actual work himself without help from Harvey. The only time Wojtola's name appears in these emails is a lone email from November of 2009, where Wojtola merely forwards a return authorization to Harvey, but it is *Harvey*, and not Wojtola, who sends the RMA to the customer. [Exhibit B, pp. D4002-4003].

The emails also show that Harvey was untruthful when listing the email addresses he had used since 2008. Several of the emails produced by Mediserve were sent *both to and from* the address jharvey@medfirstsolutions.com. [Exhibit B, pp. D3962-3964, D3985]. In addition, in the signature line quoted above, Harvey invites email recipients to reply to still another different address sales@medfirstsolutions.com. Harvey did not disclose either address at his deposition.

In addition, Defendants received a supplemental response from Medfirst, Sequoia, and Wojtola themselves on March 4, 2011, pertaining to subpoenas that Defendants had served in November. In those subpoenas, Defendants requested (among other things) documents reflecting business activity that Harvey had performed for Medfirst and Sequoia. [See generally, ECF Nos. 38-40]. These witnesses produced 21 pages of invoices, with customer information redacted, covering the time period between November 20, 2009 and March 12, 2010. [Exhibit C, pp.

D4037-4057]. The information on these invoices does not appear to match the information in the emails produced by Mediserve, indicating that Harvey was engaged in still *more* work for Medfirst and/or Sequoia beyond that reflected in the Mediserve emails. Moreover, the documents that these witnesses produced on March 4 included $13,800 in cancelled checks issued by Medfirst, payable to Harvey, some of which appear to bear Harvey's handwritten indorsement. [See Exhibit C, pp. D4032-4036]. The existence of these paper checks and indorsements is inconsistent with Harvey's deposition testimony, where he had claimed that Wojtola had "deposited" money directly into Harvey's bank account by some unknown means. [Harvey Dep. 82:14-83:23].

### III.
### ARGUMENT

**A.** **Standard of Review.**

It is "universally acknowledged" that District Courts have the inherent authority, independent of the Federal Rules of Civil Procedure, to monitor the conduct of the litigants appearing before it, police the integrity of the proceedings before it, and fashion appropriate remedies where necessary:

> It has long been understood that "certain implied powers must necessarily result to our Courts of justice from the nature of their institution," powers "which cannot be dispensed with in a Court, because they are necessary to the exercise of all others." United States v. Hudson, [11 U.S. 32, 7 Cranch 32, 34 (1812)]; see also Roadway Express, Inc. v. Piper, [447 U.S. 752, 764 (1980)] (citing Hudson). For this reason, "Courts of justice are universally acknowledged to be vested, by their very creation, with power to impose silence, respect, and decorum, in their presence, and submission to their lawful mandates." Anderson v. Dunn, [19 U.S. 204, 6 Wheat. 204, 227 (1821)]; see also Ex parte Robinson, [86 U.S. 505, 19 Wall. 505, 510 (1874)]. These powers are "governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." Link v. Wabash R. Co., [370 U.S. 626, 630-631 (1962)].

Chambers v. NASCO, Inc., 501 U.S. 32, 43 (1991). The inherent authority of a District Court includes the ability "to conduct an independent investigation in order to determine whether it has been the victim of fraud." Id. at 44 (citing Universal Oil Products Co. v. Root Refining Co., 328 U.S. 575, 580 (1946)). The Sixth Circuit has held that Chambers "should be read broadly to permit the district court to resort to its inherent authority to sanction bad-faith conduct, even if the court has not expressly considered whether such conduct could be sanctioned under all potentially applicable rules or statutes. … [T]he district court needs the discretion and flexibility to exercise its inherent authority to address various impermissible litigation practices." First Bank v. Hartford Underwriters Ins. Co., 307 F.3d 501, 514 (6th Cir. 2002).

This inherent authority includes the ability to impose sanctions – including terminating sanctions of dismissal or default judgment[3] – against a litigant who perjures himself or otherwise commits a fraud upon the Court. Chambers, 501 U.S. at 45; Aoude v. Mobil Oil Corp., 892 F.2d 1115, 1118 (1st Cir. 1989) (terminating sanctions are appropriate where a party has "commit[ed] a fraud on the court" by "sentiently set in motion some unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate a matter by improperly influencing the trier or unfairly hampering the presentation of the opposing party's claim or defense"; Pope v. Federal Express Corp., 974 F.2d 982, 984 (8th Cir. 1992) ("When a litigant's conduct abuses the judicial process, the Supreme Court has recognized dismissal of a lawsuit to be a remedy within the inherent power of the court"); Wyle v. R.J. Reynolds Industries, Inc., 709 F.2d 585, 589 (9th Cir. 1983) ("courts have inherent power to dismiss an action when a party has

---

[3] Defendants include an argument about terminating sanctions in this Memorandum because the cases that Defendants have located in which a party is found to have fabricated deposition testimony on material issues each impose terminating sanctions as the appropriate remedy. Moreover, including argument concerning the propriety of terminating sanctions in this brief will eliminate the need for further briefing on the legal standard for such sanctions, which will aid the expedited resolution of this issue.

willfully deceived the court and engaged in conduct utterly inconsistent with the orderly administration of justice").

Before imposing terminating sanctions, courts should consider whether the party in question exhibited "willfulness, bad faith, or fault," whether the party's opponent was prejudiced, whether the party was warned that his conduct "could lead to dismissal," and whether less drastic sanctions could address the situation.  Wu v. T.W. Wang, Inc., 420 F.3d 641, 643 (6th Cir. 2005) (citing Knoll v. American Tel. & Tel. Co., 176 F.3d 359, 363 (6th Cir. 1999)); see also Regional Refuse Sys., Inc. v. Inland Reclamation Co., 842 F.2d 150, 155 (6th Cir. 1988).  But these are not mandatory elements that must each be established separately.  For instance, a prior warning of the possibility of dismissal "is not indispensable," and terminating sanctions can be imposed without any prior warning if the circumstances warrant.  Fharmacy Records v. Nassar, 379 Fed. Appx. 522, 524 (6th Cir. 2010) (citing Link v. Wabash R.R., 370 U.S. 626, 633 (1962) (district court can "dismiss a complaint . . . even without affording notice of its intention to do so")).

**B.    Harvey Should Be Sanctioned in the Severest Possible Manner.**

The Regional Refuse factors justify the harshest possible sanctions in this case.  Indeed, as discussed below, courts consistently dismiss the claims of plaintiffs who fabricate testimony and evidence on material issues.

**1.    Harvey's False Testimony Was Given in Bad Faith.**

The first Regional Refuse factor requires conduct that is at least "tantamount to bad faith." First Bank, 307 F.3d at 519-21 (quoting Roadway Express, Inc. v. Piper, 447 U.S. 752, 767 (1980)).  The Sixth Circuit has defined "bad faith" as "the conscious doing of a wrong because of dishonest purpose or moral obliquity; . . . it contemplates a state of mind affirmatively operating with furtive design or ill will."  United States v. True, 250 F.3d 410, 423 (6th Cir. 2000).

- 10 -

The sheer volume of inaccuracies in Harvey's testimony, and their utter irreconcilability with the subsequently discovered evidence from third parties, reflects Harvey's bad faith and ill motive. Bad faith is also shown by the fact that each falsehood had the effect of concealing the true nature and extent of Harvey's relationship to Medfirst and Wojtola and the nature and extent of Harvey's work for them. Harvey admits that PartsSource, at the time of Harvey's discharge, believed that Harvey had attempted to sell parts on the side on behalf of a competing business whose name sounded like "Med Ford Solutions". [Harvey Dep. 145:3-146:1, 146:22-147:23, 284:25-285:9, 289:23-290:20]. Harvey's falsehoods also had the effect of concealing activity that was a plain violation of his covenant not to compete, a contract Harvey admits was in force during the entire time period covered by the emails in Exhibit B (though he claimed, incredulously, that his "referral" activities were not a violation). [See Harvey Dep. 88:13-92:8].

### 2. Harvey's False Testimony Prejudiced Defendants and the Court.

A defendant is prejudiced by a plaintiff's misconduct where the misconduct causes "waste[d] time, money, and effort in pursuit of cooperation which [a plaintiff] was legally obligated to provide." Harmon v. CSX Transp., Inc., 110 F.3d 364, 368 (6th Cir. 1997).

The giving of false testimony is inherently prejudicial to other litigants and is offensive to the fair administration of justice. Harvey's falsehoods have rendered his entire deposition testimony and discovery responses inherently unreliable. Defendants have thus wasted a significant amount of time, money, and effort preparing Interrogatories, reviewing responses, and preparing for and taking Harvey's deposition that have no real value. Defendants must now undertake the massive burden and expense of independently verifying all of the information Harvey has provided because he cannot be trusted to have given truthful answers.

The prejudice is multiplied because Harvey's false answers related to numerous critical issues in this lawsuit. The extent of Harvey's association with Medfirst is directly related to

PartsSource's proffered legitimate, nondiscriminatory reason for Harvey's discharge, and Harvey's concealment of his true relationship with Medfirst had the effect of concealing evidence that PartsSource's proffered reason had credence. Harvey's falsehoods also concealed conduct that relates directly to PartsSource's setoff defenses, wherein PartsSource alleged that Harvey engaged in acts of unfair competition against PartsSource in violation of his noncompete agreement and PartsSource's trade secret rights that should be set off against Harvey's claimed damages [see ECF No. 33, ¶¶205-207]. And, of course, Harvey's concealing of his mitigation efforts prejudiced Defendants' ability to collect evidence of Harvey's efforts to mitigate his claimed damages.

> **3. When Litigants Fabricate Testimony and Commit Other Frauds on the Court, Courts Uniformly Impose the Sanction of Dismissal Without Any Prior Warning.**

The Court can impose a dismissal sanction without a prior warning if the Court determines that, given the circumstances, a prior warning was unnecessary. Link, 370 U.S. at 633; Fharmacy Records, 379 Fed. Appx. at 524. In the case of fabricated testimony, "because the perjurious testimony [is] given under oath, an additional warning would [be] superfluous at best. 'Once a witness swears to give truthful answers, there is no requirement to warn him not to commit perjury or, conversely to direct him to tell the truth. It would render the sanctity of the oath quite meaningless to require admonition to adhere to it.'" Chavez v. City of Albuquerque, 402 F.3d 1039, 1045 (10th Cir. 2005) (quoting Webb v. Texas, 409 U.S. 95, 97 n.* (1972)).

> **4. Only the Harshest Sanctions Would Adequately Address Harvey's Misconduct.**

The severest possible sanctions are necessary not merely to penalize Harvey and remedy the prejudice that Defendants have suffered, but also to "deter those who might be tempted to such conduct in the absence of such a deterrent." National Hockey League v. Metropolitan Hockey Club, Inc., 427 U.S. 639, 643 (1976).

At a bare minimum, this Court should prohibit Harvey from testifying in this lawsuit in any capacity, including at trial, and his entire deposition must be stricken accordingly. Rodriguez v. M&M/Mars, No. 96 C 1231, 1997 U.S. Dist. LEXIS 9036, *6 (N.D. Ill., Jun. 23, 1997) (striking testimony is a proper sanction for fabricated testimony). Any sanction short of this would only reward Harvey for his false testimony. The Court should also order Harvey to reimburse Defendants for their costs and attorneys' fees associated with the preparation for and taking of this deposition, the preparation and service and review of his Interrogatory answers and the preparation of the instant Motion and related hearing.

However, the customary sanction for false testimony under oath is dismissal with prejudice, because "a perjurer should not be rewarded with a judgment." ABF Freight Sys., 510 U.S. at 842 (Scalia, J., concurring). The court in Rodriguez, supra, a Title VII case, imposed the sanction of dismissal for fabricated testimony that was far less egregious than Harvey's. The plaintiff in Rodriguez testified at her deposition that she had never been convicted of a crime, when in fact she had been convicted of several serious felonies and had been incarcerated for five years. Id. at *4. The plaintiff also testified at her deposition that her employment application was accurate, even though it stated that she "had been unemployed, caring for her sick father" during the time she was actually in prison. Id. The court held that this "egregious conduct, on its own, warrants dismissal of plaintiff's action," and explained its reasoning as follows:

> [P]laintiff intentionally attempted to mislead defendant and this court. She was aware of her obligation to tell the truth at the deposition and intentionally violated it. Parties who wish to use the judicial system to settle disputes have certain obligations and responsibilities. One of those responsibilities is to tell the truth in a deposition…
>
> In the instant case, plaintiff sought to conceal relevant information bearing directly upon her credibility both as a witness and a litigant. Issues of credibility are particular important in Title VII matters. Sarsha v. Sears, Roebuck & Co., 3 F.3d 1035, 1038 (7th Cir. 1993).

- 13 -

>This court cannot and will not allow a litigant to so abuse the judicial process.

Id. at *5-6 (emphasis added, citation omitted).  The court also noted that even if it were to consider lesser sanctions, "it would strike plaintiff's deposition," which would necessarily result in dismissal of her claims anyway for a lack of evidence.  Id. at *6.

Similarly, in Vargas v. Peltz, 901 F. Supp. 1572 (S.D. Fla. 1995), a Title VII sexual harassment and retaliation case, the plaintiff produced a pair of womens' underpants at her deposition and claimed at the deposition that the defendant had given her the underpants and asked her to "pose" for him while wearing them.  Id. at 1573-74.  In fact, the particular underpants in question were not even manufactured until after incident in question had taken place, and the plaintiff later admitted that she bought the underpants prior to the deposition.  Id. at 1575 n.6.  In the same proceeding, the plaintiff also gave false testimony about being fearful of being deported to Costa Rica because a letter that she had received from the State Department, when in fact the letter related only to naturalization proceedings that the plaintiff herself had initiated.  Id. at 1575-76.  The court held that "[t]he false introduction of the panties evidence, as well as the fabricated use of the State Department letter requires imposition of sanctions against Plaintiff, including dismissal of this action."  Id. at 1578.  See also Pope v. Federal Express Corp., 974 F.2d 982, 984 (8th Cir. 1992) (dismissal was proper against a plaintiff who had manufactured a purported handwritten love note from her supervisor and lied at her deposition about the note's origin); Radecki v. GlaxoSmithKline, 646 F. Supp.2d 310, 312-16 (D. Conn. 2009) (dismissal was the proper sanction in an FMLA retaliation case where the plaintiff perjured himself by claiming that his ability to mitigate damages were hampered because he had cancer, when in fact he never had cancer); REP MCR Realty, LLC v. Lynch, 363 F. Supp.2d 984, 1013-14 (N.D. Ill. 2005) ("Lynch's testimony at the Sanctions Hearing was not credible and was often wilfully false.  Such

perjury constitutes another, substantial reason for dismissing his … claims with prejudice"); Knapp v. Convergys Corp., 209 F.R.D. 439, 442 (E.D. Mo. 2002) (dismissal was the proper sanction where the plaintiff "gave perjurious answers in her interrogatories and during her deposition").

## IV.
## CONCLUSION

For the foregoing reasons, this Court should impose the harshest possible sanctions against Harvey.

Respectfully submitted,

ZASHIN & RICH CO., L.P.A.

By: *s/B. Jason Rossiter*
Stephen S. Zashin (Ohio Bar No. 0064557)
ssz@zrlaw.com
B. Jason Rossiter (Ohio Bar No. 0069775)
bjr@zrlaw.com
55 Public Square, 4th Floor
Cleveland, Ohio 44113

Attorneys for Defendants, PartsSource, Inc., Donald Hubbard, Jeffrey Dalton, and Nancy Swisher.

## CERTIFICATE OF SERVICE

I certify that on March 14, 2011, I electronically filed the foregoing "*Defendants' Memorandum of Points and Authorities in Support of Motion for Sanctions.*" All parties and counsel will receive service of this filing through the Court's electronic filing system and may access the filing through the Court's system.

*s/B. Jason Rossiter*
One of Defendants' Attorneys